THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JOSEPH COMFORT, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LARRY
COMFORT, Appellant.

Fourth Department, December 20, 1985

## APPEARANCES OF COUNSEL

*Moot & Sprague (Joseph Sedita* of counsel), for Joseph Comfort, appellant.

*Raymond Urbanski* for Larry Comfort, appellant.

*Kenneth R. Fisher* for respondent.

## OPINION OF THE COURT

SCHNEPP, J.

On the night of December 5, 1980 the defendant Joseph Comfort shot to death undercover New York State Police Investigator Robert Van Hall and grievously wounded his partner, William Gorenflo. This incident was the culmination of events which began on November 14, 1980 with the arrival in Corning, New York, of Jose Otero and Edwardo Blanco from Florida with 28 ounces of cocaine. The drugs were delivered to the defendant Larry Comfort who accepted them on assignment for sale and distribution in the Corning area and for which he agreed to pay $2,000 per ounce when the drugs were sold. Thereafter, Larry attempted to distribute and sell the cocaine. On November 28, 1980, Otero and Blanco

returned to Corning in an effort to secure payment for the drugs and Larry eventually paid them approximately $10,750. Trial testimony reflected that Larry had neither the remaining $46,000 which he owed them nor the bulk of the cocaine and that when Otero and Blanco pressed their demands upon him either to pay for the cocaine or return it to them, he became frightened and confused and expressed fears for his safety and that of his young son. After the partial payment was made Otero and Blanco were arrested at about 2:30 on the morning of December 5 by the New York State Police who seized the money, a small quantity of cocaine and a gun. At the instance of State Police investigators, Otero and Blanco contacted Larry on December 5 and attempted to arrange for the return of the balance of the cocaine. Larry in turn later enlisted · the aid of his brother Joseph who obtained the concealed cocaine which remained and in a clandestine manner returned it to Otero and Blanco in the early evening of December 5. These events were monitored by the State Police who determined to arrest Larry on drug charges. Following the transfer, Larry and Joseph returned to the home of Camille Comfort, Larry's ex-wife. Troopers William Gorenflo and Robert Van Hall, who were working undercover in an unmarked Plymouth automobile, placed the home of Camille Comfort, where the red Monte Carlo Chevrolet reportedly used in the drug transfer was parked, under surveillance in an effort to apprehend Larry Comfort. The Comforts observed the surveillance and feared that they were being followed by cohorts of Otero and Blanco. Larry left the house on foot and determined that he was being followed by the unidentified men. He eluded the undercover officers and when he returned a short time later to Camille Comfort's house, he told Joseph to "Grab the gun and come with me * * * the Cubans are going to kill me." Earlier in the day Larry had asked Joseph to get his shotgun and put it in the car they were then using. The defendants then left in the Monte Carlo and drove around to try to identify the occupants of the Plymouth. Larry drove the car and Joseph was in the back seat with the shotgun. After the officers observed that the Monte Carlo was gone from the house, they left the area but soon observed behind them the car containing the defendants. As the Comforts accelerated and passed the officers' unmarked Plymouth, Joseph told Larry that he observed a "hippie kid" driving the car and an "old man" in the car. It is not disputed that the Plymouth followed in pursuit, that both cars drove through a

"stop sign" and that the defendants' Monte Carlo turned into a lighted car wash, came to a stop, and was immediately rammed on the driver's side by the Plymouth. The two vehicles came to rest side by side. Joseph testified that as Larry yelled "Hold on, they're going to ram us," he placed two deer slugs into the shotgun. After the collision Joseph observed the two men in the Plymouth, heard Larry shout "Run, they're going to kill us", and he then fired the shotgun. The bullet pierced the side window of the Plymouth, struck and killed Van Hall, who was seated in the passenger seat, passed through his body and struck Gorenflo in the back. Using his vehicle as cover Gorenflo fired two shots at Larry and Joseph as they ran; however, Joseph reached the corner of the car wash and Larry vanished into the darkness. Within a minute Joseph shot and grievously wounded Gorenflo.

The six-count single indictment charged that the defendants "intentionally aiding and being aided by each other" murdered Van Hall and attempted to murder Gorenflo. After an extensive trial the jury found both defendants guilty of murder in the second degree of Robert L. Van Hall, guilty of attempted murder in the second degree of William Gorenflo and guilty of first degree sale and possession of a controlled substance.

The principal issues on appeal are based on the defendants' contentions that: (1) the verdicts convicting them of murder and attempted murder were against the weight of the evidence; (2) the trial court committed reversible error in charging the jury to evaluate their justification defense based on what an ordinary, prudent man would have done; and (3) their due process rights were violated when the court refused to order disclosure of the identity of an informant which prevented them from obtaining information relative to their duress defense on the drug charges.

### LARRY COMFORT

■ Since this defendant did not fire any shot during the course of the incident, his convictions of murder and attempted murder in the second degree were necessarily predicated on a theory of accessorial liability (Penal Law § 20.00). For both charges the prosecution must show his intent to cause death (Penal Law §§ 20.00, 110.00, 125.25 [1]). A review of the record reveals that the People failed to introduce sufficient evidence to sustain the convictions.

From November 14 to December 5, Larry and the two men he referred to as the "Cubans" engaged in a cocaine enterprise operated in Corning. On the evening of the incident he planned to extricate himself from that drug scheme. After arranging to transfer the remaining cocaine to Otero and Blanco, Larry procured the services of the codefendant, his brother Joseph, to carry out the transaction. Following the drop-off, Larry told Joseph that he feared Otero and Blanco would kill him because he diluted the cocaine. When Larry reentered Camille's house upon ascertaining that the occupants of the Plymouth were following him, he instructed Joseph to "Grab the gun and come with me". As Larry drove alongside the Plymouth, Joseph informed him that it did not have Florida license plates and that its occupants were not Otero and Blanco. While Larry drove into the car wash area and stated "Hold on, they're going to ram us," Joseph loaded the shotgun. Subsequent to the collision but prior to any shooting, Larry yelled "Run, they're going to kill us" and exited the Monte Carlo.

Larry's behavior in insisting that they drive into the night armed with a shotgun does not establish beyond a reasonable doubt an intent to kill the Plymouth's occupants, nor was there any proof or an agreement or common design between the brothers to kill them. The record is consistent with a spontaneous, independent decision by Joseph to shoot the undercover officers (see, People v Summerset, 100 AD2d 947). The defendants left Camille's house for the avowed purpose of discovering if Otero and Blanco were connected with the Plymouth. The act of driving around Corning with a shotgun is not inconsistent with that objective and does not prove an intent to hunt down and kill the investigators. Moreover, Larry's subsequent conduct tends to disprove an inference of such intent. Rather than firing into the Plymouth while driving alongside it, Larry accelerated the Monte Carlo, drove ahead, and stopped in a well-lit area. An instant after impact Larry shouted "run" which could be interpreted as an exhortation for Joseph to escape from the area. At the time Joseph fired the initial shot every indication was that Larry was fleeing the scene. The logical inference was that Joseph formulated the intent to slay the Plymouth's occupants subsequent to Larry's warning that the Plymouth was going to ram the Monte Carlo, since he placed two deer slugs into the shotgun at that point. Alternatively, it could be inferred that Joseph spontaneously resolved to slay the Plymouth's occupants after

Larry issued a warning that the occupants were going to kill them and after he saw the occupants turn to exit the Plymouth. Either way, it may be considered to have been a spontaneously formed and independent intent on the part of Joseph.

Without adequate proof of shared intent with the principal actor, there is no basis for finding that Larry acted in concert with Joseph, the actual killer *(see, People v McLean,* 107 AD2d 167, 169). In addition, where a defendant's conviction is based entirely upon circumstantial evidence, as here, the facts from which the inference of his guilt is drawn must exclude to a moral certainty every reasonable hypothesis of innocence *(People v Marin,* 65 NY2d 741, 742). No proof was presented that excluded to a moral certainty the inference that Joseph spontaneously formed the decision to fire the gun or that Larry ever knew of his brother's intention to kill Van Hall and Gorenflo. In the absence of such proof Joseph's homicidal intent should not be imputed to Larry *(see, People v Bray,* 99 AD2d 470). Neither was there any evidence that demonstrated that Larry had a separate, specific intent to kill the investigators. As the inference of guilt is not the only one that can be fairly and reasonably drawn from the record, and since the evidence does not negate, beyond a reasonable doubt, every reasonable hypothesis of innocence *(People v Sanchez,* 61 NY2d 1022, 1024), the convictions for murder and attempted murder cannot be sustained.

### JOSEPH COMFORT

Joseph Comfort's sole defense at trial to the charges of murder and attempted murder was that of justification. There was no question that he fired the shots which killed Van Hall and seriously wounded Gorenflo. Nor is there any doubt that the defendant intended to kill his victims. Van Hall was shot in the back at close range and killed and there was proof that, but for the fortuitous circumstance that the second deer slug was deflected off Gorenflo's gun, the shot would have struck him squarely in the face or chest.

Justification is a defense which must be disproved by the People beyond a reasonable doubt *(People v Reed,* 40 NY2d 204, 209). Penal Law § 35.15 (2) provides that a person may use deadly physical force upon another person when he reasonably believes that such person is using or is about to use deadly physical force against him and he cannot with complete safety avoid the confrontation by retreating. The defen-

dant's state of mind is critical when a claim of justification is raised *(People v Miller,* 39 NY2d 543, 548); however, "[t]he defense is only available where the belief of the defendant that he was subject to an imminent attack is a reasonable one" *(supra,* p 548). "The jury must consider the defendant's subjective belief as to the imminence and gravity of danger and whether this subjective belief was reasonable" *(People v Wagman,* 99 AD2d 519, 520).

The trial court charged the jury to determine whether an "ordinary reasonable person in place of the defendants would be justified" in reasonably believing that deadly physical force was necessary to defend himself. This defendant argues that the trial court erroneously charged an "objective standard" which distracted the jury from considering his subjective belief. The People argue that the charge as a whole was proper and focused the jury's attention on the defendants' subjective state of mind and that the use of the objective "ordinary reasonable person" standard was at worst harmless error because the subjective and objective charges both require the jury to determine the reasonableness of defendants' belief and so present "a distinction without a difference".

■ There was no objection to the charge. Accordingly, the alleged error has not been preserved for our review as an issue of law (CPL 470.05 [2]; *see, People v Thomas,* 50 NY2d 467; *People v Calvin of Oakknoll,* 110 AD2d 1044). "[W]here justification is the central issue to be decided" an error in the charge often "warrants a new trial in the interest of justice" *(People v Fuller,* 74 AD2d 879). However, "[n]ot every case in which sufficient evidence is adduced to warrant a justification charge automatically requires an interest of justice reversal based upon an inadequacy in the charge." *(People v Swinson,* 111 AD2d 275, 276-277.) If, under the totality of the circumstances, there is strong evidence of guilt before the jury to rebut defendant's justification defense, a reversal in the interest of justice is not warranted *(see, People v Swinson, supra; People v Gutierrez,* 105 AD2d 754; *People v Gonzalez,* 80 AD2d 543). Of course, the jury's verdict against the defendant entitles the People to the most favorable view of the evidence, including all permissible inferences *(People v Contes,* 60 NY2d 620; *People v Kennedy,* 47 NY2d 196; *People v Rodriguez,* 111 AD2d 879).

Here, Joseph Comfort was convicted of two separate and distinct shootings involving the murder of Van Hall and the

wounding of Gorenflo. In our view, the conviction for the attempted murder of Gorenflo must be affirmed.

There was overwhelming proof based on the physical evidence and the testimony of eyewitnesses that Joseph Comfort, having initially escaped from the zone of immediate danger, circled around the car wash to get an unobstructed shot at Gorenflo and ambushed the trooper as he crouched next to his car.

As previously discussed, the use of deadly physical force in self-defense is prohibited unless the defendant "reasonably believes" the victim is using or about to use deadly physical force. Even then, the defendant "may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating" (Penal Law § 35.15 [2] [a]; *People v Rodriguez,* 111 AD2d 879, 880, *supra*).

Penal Law § 35.15 (2) (a) requires the People to prove beyond a reasonable doubt that the defendant *knew* he could safely retreat. The proof was overwhelming that Joseph Comfort safely retreated out of danger, that he was aware he had successfully escaped and that he turned the situation to his own advantage by adopting the role of aggressor and advanced on Gorenflo and shot him with an intent to kill.

Joseph Comfort's claim of self-defense to the shooting of Gorenflo was based on his testimony that Gorenflo was wounded in an exchange of gunfire just seconds after the crash as defendant was fleeing from the cars and toward the east end of the car wash. He testified that Gorenflo fired at him as he ran and that the bullet struck the wall of the car wash and that he returned the fire with a quick shot "from the hip" and then ran from the scene. His testimony was totally contradicted by the physical evidence and the prosecution's witnesses.

Gorenflo testified that after Van Hall was shot he observed the Comfort brothers running away—one running straight away while the other, carrying an object, broke to the left. He fired two shots. One bullet was later found in the wall of a nearby bar while the other struck the corner of the car wash. No shot was fired back, and Gorenflo then went to the radio in the front of the car to call for assistance. After that he returned to the rear of the car. Crouching next to the car he "panned" the area. As he turned to his left, facing the car wash, he felt a blast to his face and fell to the ground.

Gorenflo's testimony was supported by that of Howard Briggs. According to Briggs, he was driving to a grocery store located a short distance from the car wash when he heard shooting. Briggs pulled into the driveway of a Dunkin Donuts located kitty-corner from the car wash and got out of his car. He observed Gorenflo standing with his arms stretched over the top of his car and then he heard a gunshot and saw smoke drifting away from Gorenflo. Briggs then got back into his car, which he parked, exited his car again and ran to the street corner opposite the car wash. When he reached the corner, Briggs saw Gorenflo crouching and also saw him turn to his left. He heard someone, he assumes it was Gorenflo, say "drop it" or "I said drop it" then heard another shot and saw Gorenflo fall. He estimated that about one minute elapsed from the initial shot until he heard the shot that felled Gorenflo. Briggs did not see where the shot came from and at that point he turned and ran away from the scene and toward the grocery store to summon the police.

Professor Herbert MacDonell, an expert in blood splatter analysis, testified that he could determine the trajectory and point of origin of the bullet which struck Gorenflo from the blood and flesh on the trunk of the Plymouth. He determined that at the time he was hit Gorenflo had turned to face the car wash, i.e., to his left, and that his face was 43 inches to 45 inches from the ground and 3 inches from the upper left corner of the trunk. This indicates that Gorenflo, who is six feet four inches tall, was crouching very close to his car. Based on the angle of dispersion of the blood splatter, MacDonell pinpointed generally the direction of the shot. According to MacDonell, the shot emanated from the middle of the car wash and could not have come from the east end of the building as claimed by the defendant.

Viewing the evidence in the light most favorable to the People, there is no question that Joseph Comfort had the opportunity to retreat, that he knew he could retreat and that he used the fact that he was safely out of Gorenflo's line of vision to circle around the car wash and fire a second shot from an unobstructed position facing the driver's side of the Plymouth as Gorenflo "panned" toward him. In light of the overwhelming evidence rebutting the defense of justification with respect to the attempted murder of Gorenflo, reversal is not warranted.

■ The only issue raised by either defendant relative to the convictions for possession and sale of a controlled substance is

that the disclosure of an informant's identity was essential to a full and fair hearing on their alleged defenses of agency and duress. In our view, the informant's identity was withheld from the defendants in a proper exercise of the trial court's discretion. The indictment charged defendants with possession of a controlled substance between November 13 and December 6, 1980 and the sale of the drugs to Otero and Blanco on December 5. The court instructed the jury to focus its attention exclusively on the transactions of December 5. In regard to that date the proof was overwhelming that both defendants possessed the cocaine and that they both participated in the transfer of possession of the drugs to Otero and Blanco.

Accordingly, the conviction of Larry Comfort of murder and attempted murder in the second degree should be reversed on the law, the sentences vacated and these counts of the indictment against him dismissed, the conviction of Joseph Comfort of attempted murder in the second degree and the convictions of both defendants of first degree criminal sale of a controlled substance and first degree criminal possession of a controlled substance should be affirmed.

DOERR, J. P., BOOMER, O'DONNELL and PINE, JJ., concur.