THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HUMBERTO ACOSTA, Appellant.

First Department, January 30, 1992

## APPEARANCES OF COUNSEL

*Anthony Suarez* of counsel *(Suarez & Canals,* attorneys), for appellant.

*Leonard I. Picker* of counsel *(Morrie I. Kleinbart* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

MURPHY, P. J.

After a jury trial the defendant has been convicted of criminal sale of a controlled substance in the first degree and criminal possession of a controlled substance in the first degree and sentenced to concurrent prison terms of 17 years to life.

The proof at trial established that Cezar Gabilanez, a drug dealer turned police informant, arranged to purchase 10 kilograms of cocaine from Gustavo Correa. In pursuance of this arrangement Gabilanez, on January 21, 1988, went to the Tropical Bar, located at 1351 St. Nicholas Avenue in Manhattan, where he met with Correa. When Gabilanez arrived at the bar, Correa explained to him that the drugs were not at the bar but would be sent for and would be brought shortly. An associate of Correa named Felix DeLeon made a phone call after which Gabilanez was reassured by one Albeiro Morcillo that the drugs would soon be delivered. Some twenty minutes after DeLeon's phone call, the defendant, a livery cab driver, arrived outside the Tropical Bar in his cab. He double parked his vehicle and entered the bar carrying a black nylon bag.

Once in the bar, he deposited the bag near Gabilanez. Correa then took the bag and, leaving the defendant in the front of the bar, went with Gabilanez to a more secluded part of the bar separated from where the defendant stood by a partition. There, the bag was opened and the packaged cocaine inside shown to Gabilanez. After examining the cocaine, Gabilanez took the bag of narcotics and left the bar in the company of DeLeon. The two men hailed a gypsy cab, purportedly to go to the location where Gabilanez had left the money to pay Correa. A short time later they were arrested and the bag which contained three one-kilogram bricks of cocaine was seized.

About 10 minutes after Gabilanez and DeLeon left the Tropical Bar, the police entered the bar and arrested Correa, Morcillo and the defendant who had not yet left. In the ensuing search of the premises, one additional kilogram brick of cocaine was found in a garbage can in the rear of the bar. A search of Morcillo disclosed the business cards of numerous livery cab services including the one for which the defendant worked. Also found on Morcillo's person were three photographs later entered in evidence. One was of the defendant alone inside the Tropical Bar, another was of the defendant, Correa and DeLeon drinking together in the bar, and the last was of Correa and DeLeon.

It is the defendant's threshold contention that the evidence was insufficient to establish that he knowingly possessed or took part in the sale of the cocaine which he delivered to the bar. He maintains that he did no more than discharge his duties as a livery cab driver—that he picked up and delivered the bag without knowing what it contained. In this regard, the defendant points out that there was absolutely no direct evidence that he knew what was in the black nylon bag; the bag was closed and there is no evidence indicating that he looked inside the bag or that the bag's contents were discussed in his presence. Indeed, it would appear from Correa's conduct in the bar that conspicuous care was taken not to open the bag, or to transact any business respecting its contents within the defendant's sight or hearing. The defendant further points out that there was no dispute that he was, in fact, a livery cab driver. The owner of the cab service for which the defendant worked testified that the defendant had driven for his service for five years. The owner also testified that livery cabs were routinely used for the delivery of packages and other items, as well as for the transport of persons. One of the defendant's

customers testified that she regularly called upon the defendant to take her children to school and to deliver food to her husband.

The People's witnesses acknowledged that gypsy cab drivers were sometimes used by drug rings as "blind mules", that is, as couriers who were unaware that their services were being retained for the transport of contraband. Gabilanez testified that in his experience as a drug dealer, which was extensive, narcotics were rarely delivered the same way twice. He noted in confirmation of this general observation that, as a street-level distributor of drugs, he had over the course of several years made numerous purchases of large quantities of narcotics from Gustavo Correa but had never had any contact with or even heard of the defendant until their January 21, 1988 encounter at the Tropical Bar. The defendant, in fact, had no prior criminal record.

The People's claim to have proven beyond a reasonable doubt that the defendant knowingly possessed and sold cocaine rests essentially on the strength of a single inference. Simply stated, the People maintain that because the defendant undeniably possessed the contraband, the jury was permitted to infer that he knew what it was he possessed.

It is, of course, true that in *People v Reisman* (29 NY2d 278, 285), the Court of Appeals stated that "[g]enerally, possession suffices to permit the inference that the possessor knows what he possesses, especially, but not exclusively, if it is in his hands, on his person, in his vehicle, or on his premises". However, as the *Reisman* court was careful to note, the strength of the inference is not something which can be assessed in the abstract; it will depend upon the particular circumstances in which the inference is to be drawn *(People v Reisman, supra,* at 285-287). The inference of knowledge from the fact of possession, after all, rests on nothing more than the common, and it would seem frequently justified, perception that those who come into the possession of contraband most probably know the nature of what they possess *(supra).* Where, however, there are circumstances which make it less probable that the possession is knowing, the inference will be deprived of much, if not all, of its force. And, even an inference which may initially seem compelling is subject to rebuttal *(see, supra).*

In *Reisman (supra),* the court, after a general discussion of the theoretical bases of the inference of knowledge from the

fact of possession, went on to assess the strength of the inference in the specific factual context there presented. In this regard, the court observed, "[t]he probabilities justifying the inference of knowledge in this case are unusually impressive" *(supra,* at 287). And, indeed they were. The defendant in *Reisman* had, at the time of his arrest, just claimed a large package of marihuana from an airport freight terminal. The package, which the defendant recognized and claimed as his from afar, had clearly been expected. As it turned out, the package had been shipped on consignment in the defendant's care and the defendant had on his person a check made out to him and endorsed by him over to the consignor. The inference of guilty knowledge then, already justified by the defendant's unexplained receipt of the large shipment of contraband, was reinforced by the additional evidence showing that the defendant had been specially designated to convey the shipment to the consignee, and that he was to pay for the shipment with his own funds. Given the strength of this showing and the lack of any countervailing proof indicating that the defendant had simply been an innocent intermediary, the inference of the defendant's guilty knowledge was entirely justified.

■ The situation at bar is very different from that presented in *Reisman (supra).* Indeed, a careful examination of the essentially undisputed facts adduced by both the prosecution and the defense, leads, we think, to the conclusion that the inference which the prosecution would draw is not here warranted by the underlying probabilities. It is, after all, undisputed that the defendant was a livery cab driver. Nor was there any dispute that, in the course of practicing his vocation, the defendant would be called upon to deliver packages. The use of livery cabs for the delivery of packages was, of course, confirmed not only by the defendant's witnesses but by the prosecution's star witness, Gabilanez, who testified from his extensive personal knowledge that livery cabs were used by drug rings for the transport of narcotics and that the drivers would often perform this service ignorant of what they carried or, in the parlance of the trade, as "blind mules". The practice of using "blind mules" was additionally confirmed by Special Agent Velazco, also a prosecution witness.

What emerges from this essentially uncontroverted testimony is a perfectly plausible innocent explanation of how a cab driver, such as the defendant, might in the ordinary course of his work come to possess contraband, namely, that the driver would, in response to a call, simply pick up a

package and deliver it to the destination indicated by the customer without being apprised of the package's contents. The question, then, which must be asked is, whether, in the face of this explanation, the inference upon which the People's case rests remains viable or, put somewhat differently, whether, in these circumstances, the inference of guilty knowledge from the fact of possession can be said to be so sure as to constitute proof beyond a reasonable doubt of the defendant's culpability *(see, People v Kirkpatrick,* 32 NY2d 17, 25).

In addressing this question, it is well to bear in mind that the defendant's "burden of going forward and negativing the inference [of knowledge from the fact of possession] is a slight one" *(supra,* at 23-24). This is so both because the inference ultimately rests upon nothing more substantial than commonly perceived transactional probabilities *(supra),* and because, given the prosecution's very heavy burden of proving the defendant's guilt beyond a reasonable doubt, it follows as a matter of evidentiary logic that all that is necessary to impair fatally the strength of the inference of culpability— which itself must exclude reasonable doubt if the over-all burden is to be sustained—is some plausible evidentially grounded explanation as to how the defendant innocently came into possession of the contraband *(supra,* at 25).

It would seem clear, as a matter of law, that the present defendant met his "[slight] burden of going forward and negativing the inference" and that, as the People failed to respond with evidence shoring the crucial weakness thus exposed in their case, the case ought not to have been put to the jury. The undisputed evidence that the defendant was a cab driver and that, so far as can be discerned from the proof, he acted in that capacity when he delivered the sealed package, later found to contain contraband, to the Tropical Bar, would itself be sufficient to deprive the subject inference of the strength necessary to support a conviction. As noted, the inference of guilty knowledge from the fact of possession depends upon a careful assessment of the probability of such knowledge as an incident of the particular transaction in which the possession occurs. Given the nature of the service a cab driver renders which ordinarily entails no inquiry into what is being transported it cannot be said that a cab driver's possession of baggage and other items he has been hired to transport renders it in any measure probable that he will be aware of the nature of their contents. Indeed, precisely the opposite is the case, and, in view of the tragic pervasiveness of

trafficking in narcotics and other forms of contraband in this jurisdiction, it would be a rare cab driver who had not at some point in the practice of his vocation unwittingly transported or come into transitory possession of illicit items. This is particularly true of livery cab operators who have traditionally served areas of the city otherwise underserved because of their high incidence of crime.

The underlying realities militating against the inference at the heart of the People's case are, of course, a matter of common knowledge and undoubtedly account for the Legislature's refusal to extend the presumption of knowing possession of contraband found in automobiles, otherwise applicable to automobile occupants, to operators of vehicles for hire engaged in the lawful pursuit of their trade (see, Penal Law § 220.25 [1] [a]; § 265.15 [3] [b]). It would be anomalous, not to mention, extraordinarily unfair, to permit the prosecution the benefit of a common-law inference, as against a cab driver, of knowing possession of contraband in circumstances in which invocation of the aforecited statutory presumptions as against the same individual would be precluded, yet that is in essence what we would sanction by an affirmance. For apart from the defendant's carrying of the package of contraband the short distance from his cab to its point of delivery, conduct hardly different or more blameworthy then the transport of the package within the car, which, as noted, gives rise to no permissible presumption, there exits no basis whatsoever for the inference the People would draw.

Nor are there other circumstances, as, for example, there were in *Reisman (supra)*, fairly indicating that the defendant was, as the People essentially contend, a knowing participant in a conspiracy to deal in narcotics. There was absolutely no evidence that the defendant had any direct knowledge as to the nature of the transaction in which he had become involved. Indeed, not only was there no evidence that the defendant had ever examined the contents of the package he delivered, but, so far as can be told from the evidence, the defendant was carefully excluded from those phases of the transaction in which knowledge of the package's contents would have been imparted, either visually or through discussion. Nor, even if the argument were permissible in theory, would it be possible to contend that the defendant's history of enmeshment with the Correa drug ring would have apprised him of the nature of the specific transaction here involved, for the factual predicate for such an argument was entirely

absent; there was no evidence that the defendant had ever wittingly or, even unwittingly, performed any other service at the behest of the conspiracy. To the contrary, the People's own witness, Gabilanez, testified that in his numerous transactions with the Correa drug ring he had never before encountered the defendant.

■ While the prosecution may very well have wished to fill the evidentiary vacuum respecting the nature of the defendant's relationship, if any, with the Correa drug ring, it ought not to have been allowed to do so by introducing the aforementioned photographs seized from Morcillo. The photographs, picturing the defendant in the company of Correa and DeLeon in the Tropical Bar on an unspecified date and occasion were probative of nothing except that the men were apparently friendly. The People, however, argued that this evidence of prior association somehow made it more probable, and therefore was relevant to establish, that the defendant was an initiate to the Correa drug ring and, ultimately, that he knew what was in the bag he delivered to the Tropical Bar on January 21, 1988. But it has long been the rule that evidence showing no more than a defendant's prior association with perpetrators of a crime does not "fairly and reasonably *tend to connect the defendant with the commission of the crime" (People v Kress,* 284 NY 452, 460). To hold, as the People urge, that evidence of mere association is probative of guilt offends not only logic but the most elemental notions of fair play. Plainly, it is not the case that proof showing no more than a prior unexplained association between a defendant and putative criminals contributes to the likelihood of the defendant's criminality. There is no such thing in our system of jurisprudence as guilt by propinquity.

Moreover, even if there had been some marginal relevance to this evidence, the possibility for undue prejudice ought to have mandated its exclusion. When evidence of an unexplained past association between a defendant and others accused of crime is placed before a jury it will inevitably encourage speculation having no place in a criminal prosecution. Here, the jury had before it pictures showing the defendant and other alleged participants in a drug ring taken in the neighborhood bar where the drug transaction charged was said to have occurred. It would not be difficult when reflecting upon these photographs in an undisciplined way to weave a tale of criminality involving the defendant. It might well be supposed that because the defendant was friendly with mem-

bers of the drug ring and associated with them in a place where they conducted their business, that the defendant too must have been a part of that business. But, however tempting it might be to engage in this sort of imaginative exercise, it is clear that a man's guilt may not be premised on such rank speculation. The introduction of these photographs impermissibly encouraged the jury to make entirely unwarranted, indeed breathtaking, inferential leaps in assessing the defendant's culpability and would itself constitute grounds for reversal were we not reversing upon the more fundamental ground of evidentiary insufficiency. The crucial question in this case was whether the defendant knew what it was he delivered to the Tropical Bar on January 21, 1988. Neither reason nor fairness permits the conclusion that, because the defendant had had some previous, apparently social, encounter with other alleged members of the Correa drug ring at a popular neighborhood bar—an encounter which, for all that is known, may have taken place months or even years prior to the transaction at issue—that the defendant, therefore, knew that the bag he carried from his livery cab into the bar on the evening in question contained contraband.

When all is said and done the sole admissible evidence of the defendant's guilt was the fact that he physically possessed a bag of contraband long enough to carry it from his waiting livery cab the short distance to its designated point of delivery. The question for this court is quite simply whether, based on this lone circumstance, a defendant who has come forward with uncontroverted evidence indicating that he came to possess the contraband in the ordinary course of practicing his trade as a cab driver, may be found guilty beyond a reasonable doubt of knowing possession and sale of a controlled substance. We think it plain that to answer this inquiry affirmatively would create an unacceptably high risk of convicting and punishing the innocent, a risk which the law properly understood and applied does not permit.

Accordingly, the judgment of the Supreme Court, New York County (McLaughlin, J.), rendered June 21, 1989, convicting the defendant, after a jury trial, of criminal possession of a controlled substance in the first degree and criminal sale of a controlled substance in the first degree and sentencing the defendant to concurrent terms of from 17 years to life, should be reversed, on the law, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL

160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

MILONAS, KUPFERMAN and RUBIN, JJ., concur.

Judgment, Supreme Court, New York County, rendered June 21, 1989, unanimously reversed, on the law, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this court's order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.