■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARIO FORTUNATO, Appellant. [894 NYS2d 152]—

Appeal by the defendant from a judgment of the Supreme Court, Kings County (J. Goldberg, J.), rendered April 21, 2008, convicting him of murder in the second degree, after a nonjury trial, and imposing sentence.

Ordered that the judgment is reversed, on the facts, the indictment is dismissed, and the matter is remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.

During the early morning hours of November 30, 1994, Sabatino Lombardi and Michael D'Urso were shot by John Carlo Imbrieco and Anthony Bruno inside the San Giuseppe social club in the Williamsburg section of Brooklyn. Angelo Cerasulo was the getaway driver. Lombardi died of his injuries, but D'Urso survived. Carmine Polito and the defendant were present when the shooting occurred.

The defendant, as well as Polito, Imbrieco, Bruno, and Cerasulo, were all arrested in January 2002, after D'Urso, who was connected to the Genovese crime family, made a deal with federal prosecutors. After a trial held in the United States District Court for the Eastern District of New York in 2003, Polito and the defendant were convicted of, inter alia, violating the Racketeer Influenced and Corrupt Organizations Act (18 USC § 1961 *et seq.*) and the Violent Crimes in Aid of Racketeering Act (18 USC § 1959) by conspiring to murder D'Urso and Lombardi, and by murdering Lombardi (*see United States v Bruno,* 383 F3d 65, 77 [2004]). In 2004 the United States Court of Appeals for the Second Circuit reversed the judgments of conviction, finding the evidence supporting those convictions to be legally insufficient (*id.* at 71-72). The Kings County District Attorney's office then indicted Polito and the defendant on charges of murder in the second degree, and efforts to prevent the prosecutions on double jeopardy grounds were unsuccessful (*see Matter of Polito v Walsh,* 32 AD3d 953 [2006], *affd* 8 NY3d 683 [2007]).

Although a joint trial of the defendant and Polito was conducted in the Supreme Court, Kings County, Polito opted to have his case decided by a jury, while the defendant opted for a bench trial in order to avoid a feared "spillover effect," based on the evidence that the People had amassed against Polito. The

People's key witnesses were D'Urso, Cerasulo, and Bruno, all of whom were career criminals with prior or current cooperation agreements. One day after the jury rendered a verdict of not guilty with respect to Polito, the trial court found the defendant guilty. We reverse and dismiss the indictment.

''[W]eight of the evidence review requires a court first to determine whether an acquittal would not have been unreasonable. If so, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of the credible evidence, the court then decides whether the jury was justified in finding the defendant guilty beyond a reasonable doubt'' (*People v Danielson*, 9 NY3d 342, 348 [2007]). ''If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict'' (*People v Bleakley*, 69 NY2d 490, 495 [1987]). The appropriate standard for evaluating a weight of the evidence argument is the same regardless of whether the factfinder was a judge or jury (*see People v Zephyrin*, 52 AD3d 543 [2008]). Under the circumstances, we conclude that an acquittal would not have been unreasonable, and that the verdict was against the weight of the credible evidence.

At the trial in the Supreme Court, the People's theory was that Polito masterminded the murder plot. They also posited that the defendant assisted him by providing one of the guns used in the shooting, and by agreeing to pay for the murders.

With respect to payment, although Cerasulo testified that Polito told him that the defendant would pay for the planned executions, when Cerasulo allocuted to his plea of guilty in Federal court, he stated that Polito was the individual who financed the murders. Moreover, Bruno testified that he was unaware that the defendant had purportedly agreed to pay for the murders. Additionally, there is no evidence that anyone ever asked the defendant for money after Lombardi was killed.

The support for the People's contention that the defendant gave Cerasulo one of Polito's guns in a brown paper bag rests solely on Cerasulo's testimony, which was inconsistent and confusing (*see People v Roman*, 217 AD2d 431, 432 [1995]). In any event, even if the defendant gave Cerasulo a bag containing a gun, there was no evidence that he was aware of the bag's contents (*cf. People v Acosta*, 174 AD2d 181, 183 [1992]). Even if he were aware, there was no persuasive evidence that the defendant was aware that the gun was to be used in the shooting of D'Urso and Lombardi (*cf. People v Akptotanor*, 158 AD2d 694, 695 [1990], *affd* 76 NY2d 1000 [1990]; *People v Comfort*, 113 AD2d 420, 424 [1985]).

Instead, by all accounts, it appears that the defendant, who ran out of the club with his hands behind his head and without his personal belongings when the shots were fired, was thoroughly surprised when Bruno proceeded to shoot D'Urso in the back of the head. His reaction was consistent with the testimony of both Bruno and Cerasulo that the defendant was never present at any of the meetings at which the murder had been planned. Moreover, in 1995, Bruno prepared a note in which he listed D'Urso, Imbrieco, Polito, and others as potential murder suspects in the event that Bruno himself met an untimely end, but did not list the defendant. Bruno explained at the trial in the Supreme Court that he did not name the defendant as a potential suspect because he believed that the defendant was only present at the club on the night of Lombardi's murder due to his friendship with Polito.

The People focus on the fact that the defendant drove to New Jersey shortly after Lombardi's murder, and also gave false information to friends and the police about his whereabouts and what he had seen on the relevant night. The "probative weight [of evidence of consciousness of guilt] is highly dependent upon the facts of each particular case" (*People v Cintron*, 95 NY2d 329, 333 [2000]) and, in this instance, such evidence must be accorded little weight. Under the circumstances, the defendant's contention that an innocent person who witnessed the shooting of two individuals—at least one of whom was an organized crime associate—might fear for his or her life, flee both the scene and the State, deny being present at the scene, and deny what he or she observed at the scene, is entirely plausible (*see People v Wong*, 81 NY2d 600, 609 [1993]; *People v Marin*, 65 NY2d 741, 746 [1985]; *People v Moses*, 63 NY2d 299, 308 [1984]).

We note that the People's effort to portray D'Urso and the defendant as enemies is undermined by the fact that the defendant attended D'Urso's wedding mere months before the shooting. Additionally, the two men played cards together on a regular basis up until the night of the murder. In any event, even if the defendant had a motive to kill D'Urso, both the People's witnesses and the defendant's witnesses agreed that the defendant and Lombardi were the best of friends.

Based on this record, the conviction cannot stand (*see People v Madison*, 61 AD3d 777, 779 [2009]; *People v Zephyrin*, 52 AD3d 543 [2008]; *People v Johnson*, 250 AD2d 1026 [1998]; *People v Giocastro*, 210 AD2d 254 [1994]).

In light of our determination, we need not reach the defendant's remaining contentions. Dillon, J.P., Florio, Leventhal and Roman, JJ., concur.